United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF NINO BOSCO, BY AND THROUGH SUCESSOR IN INTEREST, FRAUKA KOZAR, et al.,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF SONOMA, et al.,<br><br>Defendants. | Case No. 20-cv-04859-CRB<br><br>**ORDER GRANTING MOTION FOR SANCTIONS** |

Nino Bosco, a mentally ill man, killed himself while in custody at the Sonoma County Main Adult Detention Facility (the "Jail") on July 17, 2019.  Bosco's mother, Frauka Kozar, in her individual capacity and in her capacity as his successor-in-interest ("Plaintiff"), sued the County of Sonoma, California Forensic Medical Group, and various individuals ("Defendants").  See Am. Compl. (dkt. 60).  Plaintiff claims Defendants violated Bosco's Fourteenth Amendment rights they were "deliberately indifferent" to his "serious medical/mental health needs" the night of his death.  Id. ¶ 64.

At issue in this motion is whether the Court should impose sanctions, and if so, what sanctions to impose, on Defendants under Federal Rule of Civil Procedure 37(e) for failing to preserve the fourteen minutes of video surveillance showing jail staff discovering Bosco's condition and removing him from his cell at the time of his death.  See Mot. (dkt. 43) at 1.  Plaintiff claims Defendants purposefully did not preserve the missing surveillance video.  Defendants claim they took reasonable steps to preserve it but failed to do so because of a technical error.  Because the Court finds that Plaintiff has met the requirements of Federal Rule of Civil Procedure 37 for imposition of sanctions, the Court

GRANTS the motion and orders that the jury be instructed that it may presume that the spoiled evidence was unfavorable to Defendants.  The Court further awards attorneys' fees to Plaintiff based on time spent working on this motion.

## I.    BACKGROUND

### A.    Parties and Witnesses

Plaintiff is Frauka Kozar, Bosco's mother.  Am. Compl. ¶ 14.  She brings this action in her individual capacity and as Bosco's successor-in-interest.  Id.  Bosco was an "accomplished musician, loving son and brother, and a valued member of his family." Am. Compl. ¶ 15.  He was also mentally ill and suffered from bipolar disorder and schizophrenia.  Id.  At the time of his death, he had been in custody for six weeks for violating a restraining order against Kozar.  Opp'n (dkt. 47) at 2.

Defendants are the County of Sonoma, California Forensic Medical Group ("CFMG"), Mark Essick, Mazen Awad, Courtney Roualades, Ricardo Oseguera, Stefanie Nevin, and Celeste Garcia.  Am. Compl. ¶¶ 4–10.  The County is "responsible for overseeing the jail, the Sonoma County Sheriff's Office, Sonoma County Correctional Deputies, . . . [CFMG]," and its employees and agents.  Id. ¶ 4.  At the time of Bosco's death, CFMG was "responsible for providing medical and mental health care at the jail." Id. ¶ 6.  Essick was Sherriff of Sonoma County and Awad was the "Sheriff's Detention Division Operations Captain" in charge of the jail.  Id. ¶ 5.  Roualdes and Oseguera are correctional deputies for the County of Sonoma.  Id. ¶¶ 7–8.  Nevin and Garcia were nurses for CFMG.  Id. ¶¶ 9–10.

Four employees of Sonoma County Sheriff's Office participated in the investigation of Bosco's death. Sergeant Ryan Mitchell, the lead detective assigned to the investigation, was then assigned to the Violent Crimes Investigation Unit.  Mitchell Decl. (dkt. 47-4) ¶¶ 1–3.  Lieutenant Jason Squires, who assisted Detective Mitchell, was present at the jail the night of Bosco's death.  Squires Decl. (dkt. 47-1) ¶¶ 1–3.  Sergeant Dominic Taurian also worked at the jail on the night of Bosco's death (July 17) through the next morning (July 18).  Taurian Decl. (dkt. 47-2) ¶ 3.  Sergeant Paul Teso was not present on the night of

Bosco's death, but he worked at the jail on July 18 and again on July 19.  Teso Decl. (dkt. 47-3) ¶¶ 3–4.

Although not a member of the investigation team, Lieutenant Bryan Cleek also works in the Sheriff's Office.  Cleek Decl. (dkt. 56-1) ¶ 1.  Lieutenant Cleek "oversaw the initial installation and implementation of the video surveillance and video management system at the [jail]" and is responsible for its maintenance.  Id. ¶ 2.  Integrated Security Controls, Inc. installed the surveillance system and serves as the surveillance consultant.  Id. ¶ 3.  Jarad Regan is the Operations Manager for Integrated Security Controls who supervised the installation and configuration of the system and helps to maintain it.  Regan Decl. (dkt. 56-2) ¶¶ 1, 3.

**B.    Bosco's Death**

On the evening of July 17, 2019, Bosco had "just been returned to the jail from a hospital following an earlier suicide attempt only hours before."  Mot. at 1.  At 9:49 p.m., jail staff performed a safety check on Bosco's cell.  First Schwaiger Decl. (dkt. 43-1) ¶ 20.  A short while later, Bosco killed himself by "shoving a bologna sandwich into his windpipe."  Mot. at 1; First Schwaiger Decl. ¶¶ 10, 20.  At 10:02 p.m., jail staff reportedly found Bosco unresponsive.  First Schwaiger Decl. ¶¶ 20, 31; Mitchell Decl. ¶ 10.  There is no surviving video surveillance footage of the jail between 9:52 and 10:06 p.m.  First Schwaiger Decl. ¶ 20.  At around 10:06 p.m., a handheld camera was switched on that depicts Jail staff's resuscitation efforts.  Id.  Shortly after that, an ambulance transported Bosco to the hospital.  Pl.'s First Reply (dkt. 55) at 1; Mitchell Decl. ¶ 9.

**C.    The Surveillance Video**

Seven months prior to Bosco's death, the jail had hired ICS to install a video surveillance system.  Cleek Decl. ¶ 3; see also Regan Decl. ¶¶ 2–3.  The surveillance system retains video for one year and one day, after which the system automatically deletes it.  Regan Decl. ¶ 4.  After deletion, the system "begins writing over the deleted files with new video."  Id.

On the night of Bosco's death, two surveillance cameras, labeled "Booking 1" and

United States District Court
Northern District of California

1   "Booking 3," were recording the exterior of Bosco's safety-cell door.  Mitchell Decl. ¶¶ 7–
2   8.  The surveillance cameras do not record audio.  Id. ¶ 8.  Detective Mitchell opened an
3   investigation into Bosco's death on the night it occurred.  Id. ¶ 3.  As part of his
4   investigation, Detective Mitchell requested "all available video" from the time of Bosco's
5   arrival at the jail to his departure in an ambulance.  Id. ¶ 5.

6       In response to Detective Mitchell's request, Lieutenant Squires, the on-duty
7   Lieutenant, instructed Sergeant Taurian to "save all video"—including from the Booking 1
8   and Booking 3 cameras—"from the time Bosco had returned from the hospital earlier that
9   evening until he was taken out of the facility by ambulance" that night.  Squires Decl. ¶¶
10  2–4.  To "save all video," Sergeant Taurian had to export the footage from a computer to a
11  thumb drive.  Id. ¶ 5; Taurian Decl. ¶ 8.  At the time, the jail had only one computer
12  system that could export surveillance video.  Squires Decl. ¶ 5.  One hour of video took
13  between two and three hours to export.  Taurian Decl. ¶ 6.

14      Sergeant Taurian began exporting the night of Bosco's death until the morning of
15  July 18, at which time Sergeant Teso took over.  Squires Decl. ¶ 6; Taurian Decl. ¶¶ 6, 9.
16  During the export, Sergeant Taurian had issues exporting the footage from the surveillance
17  system.  Taurian Decl. ¶ 9.  He received two error messages indicating that the export had
18  not finished.  Id.  Each time this occurred, Sergeant Taurian would start the export process
19  over.  Id.  When his shift ended the morning of July 18, Sergeant Taurian informed
20  Sergeant Teso that he had problems exporting.  Id.  Sergeant Teso, like Sergeant Taurian,
21  also received an error message when trying to export the video files.  Teso Decl. ¶ 8.  The
22  error message stated that "the file size for one video files [sic] had exceeded the capacity
23  of the thumb drive."  Id.  Sergeant Teso obtained a new thumb drive and did not encounter
24  any further error messages.  Id.  At the end of the export, Sergeant Teso "checked to see
25  the files had copied but did not watch the videos in their entirety."  Id.

26      Also on July 18, Lieutenant Cleek went to the Jail and viewed the footage of the
27  Bosco incident on the video surveillance system because it was "the first critical incident
28  that occurred with the [new system]."  Houston Decl. (dkt. 55-1) Ex. A at 44.  Lieutenant

4

United States District Court
Northern District of California

Cleek confirmed that the system worked.  Id.  He watched video of jail staff discovering Bosco and removing him from his cell—the now-missing footage.  Id. at 43–46.

Once he finished the export, Sergeant Teso gave to Lieutenant Squires four thumb drives containing the video files.  Teso Decl. ¶ 9; Squires Decl. ¶ 7.  Sergeant Teso did not state that he notified Lieutenant Squires of the error messages.  On July 22, three days after Bosco's death, Lieutenant Squires gave the four thumb drives to Sergeant Mitchell without reviewing the thumb drives himself.  Squires Decl. ¶ 7; Mitchell Decl. ¶ 6.  Sergeant Mitchell also received from Deputy Anthony Crivello two memory cards from handheld cameras used on the night of the incident.  Mitchell Decl. ¶ 9.

**D.     The USB Drives and Memory Cards**

The contents of the four USB flash drives and two memory cards were:

- 1st USB Flash Drive (RAM 1) – The first flash drive is 64 gigabytes and contains a video file that is 2.78 gigabytes.  The video file runs from 8:18 p.m. to 11:20 p.m. and shows the inside of the jail's "vehicle sally port."

- 2nd USB Flash Drive (RAM 2) – The second flash drive is 64 gigabytes and contains two video files that are each 1.59 gigabytes.  The first file contains video from the Booking 3 camera—showing the exterior door of Bosco's safety cell—and runs from 8:18 p.m. to 9:52 p.m.  The second file contains video from Booking 1 camera—also showing the exterior of Bosco's safety cell—and runs from 8:18 p.m. to 9:26 p.m. These are the videos that were cut short during the upload.

- 3rd USB Flash Drive (RAM 3) – The third flash drive is 64 gigabytes and contains one video file that is 2.36 gigabytes.  The video file runs from 8:05 p.m. and ends at 8:19 p.m. and shows the inside of the jail's pedestrian booking area.

- 4th USB Flash Drive (RAM 4) – The fourth flash drive is 64 gigabytes and contains one video.  Mitchell did not identify the size of this video file, how long it runs for, or what it shows.

- 1st Memory Card (AC1) – The first memory card contains one video file with audio.  The video contains no time or date stamp and runs for four minutes and twenty seconds.  The video first shows "correctional staff, CFMG medical staff, paramedics and firefighters as they render medical aid" to Bosco in the booking area of the jail.  It next shows "Bosco being placed onto [a] backboard then onto a gurney to an awaiting ambulance in the vehicle sally port area."

- 2nd Memory Card (AC3) – The second memory card contains one video file with audio.  It contains no time or date stamp and runs for twenty-four minutes.  It first shows the "intake of an unrelated individual."  Six minutes and thirty-nine seconds into the video, a voice "can be heard on the radio requesting 'code-3 ambulance' and then another voice saying 'Bosco.'"  The handheld video "then continues to move toward the safety cells in the booking area and shows CFMG medical staff along with correctional staff with Mr. Bosco out of his cell on the floor of the booking area.  CFMG medical staff along with correctional staff then begin CPR." Later, "[p]aramedics and firefighters arrive and take over Mr. Bosco's medical care."

Id. ¶¶ 7, 9.

Upon receiving the USB flash drives and memory cards, Mitchell watched the videos.  Id. ¶¶ 6–10.  Because he had requested "all available surveillance video," he believed the videos to be complete.  Id. ¶ 6.  His investigation found "no violations" and was subsequently approved by three captains, the assistant sheriff, and the sheriff.  Pl.'s First Suppl. Reply (dkt. 58) at 4–5; Schwaiger Suppl. Reply Decl. (dkt. 58-1) Ex. C.

### E.    Procedural History

On July 30, 2019, thirteen days after Bosco's death, Plaintiff's counsel submitted a Public Records Act request to Defendants, requesting all videos of Bosco while at the jail.  First Schwaiger Decl. ¶ 11.  On September 6, 2019, Sonoma County attorney Matthew

6

Lilligren responded to the Public Records Act request and refused to produce any video. Id. ¶ 12, Ex. 1.

On July 20, 2020, one year after Bosco's death, Plaintiff filed suit against Defendants. See Compl (dkt. 1). On January 29, 2021, Plaintiff requested "[a]ll video surveillance of Nino Bosco from June 11, 2019, to his death on July 17, 2019." First Schwaiger Decl. Ex. 2 at 3. On March 1, Defendants agreed to produce all video of Bosco on the day of his death. Id. ¶ 15. After not receiving the requested video, on May 5, Plaintiff filed notice of a discovery dispute. Id. ¶ 17. Two days later, Defendants delivered thirty-two gigabytes of material to Plaintiff, including fourteen video files. Id. ¶¶ 17–18.

Plaintiff's counsel initially presumed the videos were complete. Mot. at 3; First Schwaiger Decl. ¶ 20. In early September 2021, Plaintiff's counsel discovered that the video files did not contain complete footage from the Booking 1 and Booking 3 cameras. First Schwaiger Decl. ¶ 20; Mitchell Decl. ¶ 7–8. As noted above, the Booking 1 video ends at 9:26 p.m., and the Booking 3 video ends at 9:52 p.m., ten minutes before Bosco was reportedly discovered as unresponsive. Schwaiger Decl. ¶ 20; Mitchell Decl. ¶ 7.

Plaintiff's counsel then asked for the missing video from Defendants. First Schwaiger Decl. ¶¶ 22–29. In late September 2021, Defendants informed Plaintiff that the video produced "was all available video related to the Bosco incident." Id. Ex. 5. Defendants stated that they "were attempting to determine whether there was any additional video that may exist." Id. Lieutenant Cleek stated that, when he first learned of the missing surveillance video at the end of September 2021, he immediately "looked into whether there was any ability to retrieve the original videos." Cleek Decl. ¶¶ 2, 5. Lieutenant Cleek contacted Jarad Regan, Operations Manager at Integrated Security Controls, to see if there was any chance of recovery. Id. Because two years had passed since Bosco's death and the system automatically deletes files after one year and one day and begins to overwrite deleted video, Regan thought there was a low probability of recovery. Id.; see also Regan Decl. ¶ 4.

7

United States District Court
Northern District of California

Nonetheless, on November 3, 2021, Regan removed the video surveillance servers that could potentially house the missing video and installed a loaner system to reduce risk further video would be overwritten.  Cleek Decl. ¶¶ 6–7.  On December 15, detectives delivered the servers to a consultant who began the process of copying and reviewing the servers to determine if any missing video can be found.  Id. ¶ 7.

At the first hearing on this motion on January 20, the Court instructed Defendants to conclude their data recovery efforts and the parties to confer and stipulate to a proposed sanction, if possible.  On September 30, the parties reported that the consultant had concluded its review of the available files on the jail's servers and confirmed that the missing video could not be recovered.  Sept. 30 Joint Status Report (dkt. 85) at 2.  The parties asked that a second motion hearing date be set, and the parties requested supplemental briefing, as they were unable to agree on an appropriate sanction.  Id. at 2–3.  The parties then filed supplemental briefing in anticipation of the November 4 hearing.  Pl.'s Second Suppl. Brief (dkt. 88); Def.'s Second Suppl. Brief (dkt. 89).

### F.      The Alleged Technical Error

According to Defendants, the video footage from the Booking 1 and Booking 3 cameras was not preserved because of "technical error."  See, e.g., Opp'n at 3.  Regan reviewed the thumb drives used by Sergeants Taurian and Teso and states that they were not compatible with the size of the video exports that Taurian and Teso attempted.  Regan Decl. ¶ 7.  The footage from the Booking 1 and Booking 3 cameras did not fully copy to the USB flash drive because "[e]xports from VMS over 2GB are not supported for FAT32 disks."  Id.  Regan confirmed this by reproducing this situation in a test.  Id.  Regan states that this explains why the USB flash drive for the Booking 1 and Booking 3 cameras "stopped exporting the files once they reached the total file size of 1.59 GB."  Id. ¶ 9.  The computer likely "recognized that the video files were going to exceed the file size limitations for the FAT32 formatted USB thumb drives" and thus stopped exporting the video files.  Id.  Regan also states that the jail's surveillance system software prevents users from being able "to delete or remove any stored video" from within the system's

8

software.  Id. ¶ 5.

Plaintiff offers reasons to doubt Defendants' narrative.  First, Regan's explanation is inconsistent with the fact that two USB flash drives (RAM 1 and RAM 3) fully exported video files over two gigabytes while RAM 2 (which contained video from the Booking 1 and 3 cameras) could not.  Pl.'s First Suppl. Reply at 6.  Second, although Sergeant Mitchell watched the videos on the flash drives during his investigation, he somehow never noticed or commented on the fact that the videos suddenly stopped before jail staff removed Bosco from his safety cell.  Id. at 1–2.  Third, Lieutenant Squires testified that he believed that Sergeant Mitchell had received all video.[1]  Id. at 3–4.  Fourth, although Lieutenant Cleek found out in late September 2021 that the video was missing and at risk of being overwritten, he did not take the server offline to recover it until November 3.  Id. at 2–3.  Fifth, Defendants originally argued in response to the July 2019 Public Records Act request that it had no duty to preserve the video, which suggests that it did not bother to do so and that the "technical error" argument is a post hoc explanation.[2]  Id. at 2.  Plaintiff argues that these inconsistencies, taken together, suggest that Defendants either cropped the videos to remove damning evidence or intentionally allowed the video to expire.  Id. at 5.

## II.    LEGAL STANDARD

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."  Compass Bank v. Morris Cerullo World Evangelism, 104 F. Supp. 3d 1040, 1051–52 (S.D. Cal. 2015).  As amended in 2015, Federal Rule of Civil Procedure 37(e) exclusively governs the remedies available for spoliation of electronically stored

---

[1]  Lieutenant Squires did not review the thumb drives and was not notified of any of the issues that Sergeants Taurian and Teso encountered in the export process.  Id. at 3–4; Squires Decl. ¶¶ 6–7.  Thus, he thought the video files were complete.

[2]  Plaintiff also notes that in the Sonoma County Sheriff's 2017–2018 Annual Report, an independent auditor found that Jail staff using handheld cameras failed to adequately record incidents at the jail.  Pl.'s First Suppl. Reply at 6.  It noted instances where videographer would point the camera away "just as it appeared force was being used and the inmate began screaming."  Id.  Also, in some instances "video went missing in the review process."  Id.

United States District Court
Northern District of California

information ("ESI").  Fed. R. Civ. P. 37(e); <u>see also</u> Fed. R. Civ. P. 37(e) advisory

committee's note to 2015 amendment [hereinafter 2015 Advisory Note] (stating that the

new Rule 37(e) "forecloses reliance on inherent authority or state law").

Sanctions under Rule 37(e) may be appropriate if: (1) the information qualifies as

ESI; (2) the ESI is lost and cannot be restored or replaced; (3) the ESI should have been

preserved in the anticipation or conduct of litigation; and (4) the responding party failed to

take reasonable steps to preserve the ESI.  <u>Colonies Partners, L.P. v. County of San</u>

<u>Bernardino</u>, 18-cv-420, 2020 WL 1496444, at *2 (C.D. Cal. Feb. 27, 2020), <u>report and</u>

<u>recommendation adopted,</u> 18-cv-420, 2020 WL 1491339 (C.D. Cal. Mar. 27, 2020).  If the

court finds "prejudice to another party from loss of the information," then it may "order

measures no greater than necessary to cure the prejudice."  Fed R. Civ. P. 37(e)(1).

If the court further finds that the party "acted with the intent to deprive another

party of the information's use in litigation," then it may order far more serious sanctions.

Fed. R. Civ. P. 37(e)(2). Under 37(e)(2), the court may:

> (A) presume that the lost information was unfavorable to the party;
>
> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
>
> (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e)(2); <u>see also</u> <u>Newberry v. County of San Bernardino</u>, 750 F. App'x

534, 537 (9th Cir. 2018).

## III.   DISCUSSION

Defendants do not dispute that the video was ESI subject to Rule 37[3] nor that they

had a duty to preserve it.  <u>See</u> Opp'n at 3; Suppl. Opp'n (dkt. 56) at 2.  They also do not

dispute that the video is lost, now that their consultant has finished their work and

---

[3] ESI includes "photographs, sound recordings, images, and other data or data compilations stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form."  Fed. R. Civ. P. 34(a)(1)(A). The video footage here is "other data or data compilations" because it is data stored on a computer server from which the information can be obtained directly.  <u>See, e.g.,</u> <u>Phan v. Costco Wholesale</u> <u>Corp.</u>, 19-cv-5713, 2020 WL 5074349, at *2 (N.D. Cal. Aug. 24, 2020).

concluded that the video could not be recovered.  Def.'s Second Suppl. Brief at 8; <u>see also</u> Sept. 30 Joint Status Report at 2.  Defendants' principal arguments are: (1) they took reasonable steps to preserve the video; and, even if the Court finds that they did not take reasonable steps, (2) they did not act with intent to deprive Plaintiff of the video.  <u>See</u> Opp'n 4–5; Suppl. Opp'n 3–6; Def.'s Second Suppl. Brief at 4–7.  The Court finds neither of these arguments persuasive.

### A.    Reasonable Steps to Preserve

A party has no liability for lost ESI if it took "reasonable steps to preserve" it.  Fed. R. Civ. P. 37(e).  The 2015 Advisory Committee Notes highlight some factors a court should consider when deciding if a party took reasonable steps to preserve lost ESI: (1) a party's "good-faith operation of an electronic information system"; (2) a "party's sophistication with regard to litigation"; (3) "the extent to which a party knew of and protected against such risks"; and (4) whether the information is "destroyed by events outside the party's control," such as party's computer room flooding or a malign software attack.  <u>See</u> 2015 Advisory Note.

Defendants argue that the steps they took were reasonable.  Suppl. Opp'n at 4. They emphasize that the video recording system was only seven months old, and the Bosco in-custody death was the first in-custody death that had occurred.  <u>Id.</u> at 3; <u>see also</u> Def.'s Second Suppl. Brief at 4–5.  It was therefore "the first critical incident for which the Sheriff's Office needed to export video from the servers to a thumb drive as part of a death investigation."  Suppl. Opp'n at 3–4; Def.'s Second Suppl. Brief at 4–5.  They note that jail staff immediately began preserving all relevant video after Bosco's death, and the missing video was due to a technical error that no one knew about until after the surveillance system had deleted the missing video.  Opp'n at 4.  In short, Defendants argue that they acted in good faith and that the evidence was destroyed by events that were largely out of their control.

Yet nothing was out of their control for the year during which they had the original undeleted video file.  <u>See, e.g.,</u> Squires Decl. ¶ 5.  Defendants' argument holds true only if

11

United States District Court
Northern District of California

1  it was reasonable not to know about the "technical error" until after the video was deleted.

2  Several considerations suggest that Defendants did not act reasonably in "[knowing] of and

3  protect[ing] against the risk" during this period.  See 2015 Advisory Note.

4      First, jail staff knew that the flash drives had issues exporting the surveillance

5  video.  Both Sergeants Taurian and Teso encountered error messages when attempting to

6  export the surveillance video.  See Taurian Decl. ¶ 9; Teso Decl. ¶ 8.  Despite the error

7  messages, neither Sergeant Taurian nor Sergeant Teso confirmed that the surveillance

8  video had completely exported to the flash drive, and they did not notify Lieutenant

9  Squires of the error messages.  See Taurian Decl. ¶ 9; Teso Decl. ¶ 8; Pl.'s First Suppl.

10  Reply at 4 (quoting Lieutenant Squires stating, "I wasn't advised . . . of anything that was

11  wrong with the system exporting . . . .").  Given the importance of this footage, it would

12  have been reasonable for Taurian and Teso to have notified their superiors of the issue.

13  And given the newness of the surveillance system and the fact that this was the first in-

14  custody death that required preservation of this new sort of data, someone might

15  reasonably have checked to ensure that the footage was fully and properly copied to the

16  storage devices.

17      Second, it was unreasonable for Sergeant Mitchell not to notice the missing video.

18  A death in custody is a grave issue that Defendants and their investigators take very

19  seriously.  See First Schwaiger Decl. ¶ 9, Ex. 7 at 2–3, 5–13 (detailing the Sheriff's Office

20  policy regarding in-custody suicides, which includes immediately opening a criminal

21  investigation).  The minutes surrounding the discovery of Bosco and his removal from his

22  cell would have been crucial to Mitchell's investigation.  It was unreasonable for Mitchell

23  to watch the surveillance videos from the flash drive and not notice that the videos were

24  missing footage of jail staff removing Bosco from his cell.  See Pl.'s First Reply at 3.  Not

25  surprisingly, Lieutenant Squires testified that he would have expected Detective Mitchell

26  to contact him had he found that the videos were incomplete.  Id. at 6.  Defendants never

27

28

explain why Detective Mitchell did not note the missing video.  Suppl. Opp'n at 4.[4]

These facts appear particularly unreasonable because the Jail is a sophisticated party.  See 2015 Advisory Note.  The jail has stringent policies to preserve evidence when an in-custody death occurs.  When an in-custody suicide occurs, the Sonoma County Sheriff's policy tasks an "evidence technician or crime scene investigator" with documenting "the scene for the collection, preservation, and analysis of physical evidence."  First Schwaiger Decl. ¶ 30; id. Ex 7 at 8.

On somewhat similar facts, Judge Gonzalez Rogers recently found that a defendant failed to take reasonable steps to preserve evidence.  There, a customer slipped and fell at a Costco store.  Phan v. Costco Wholesale Corp., 19-cv-5713, 2020 WL 5074349, at *1 (N.D. Cal. Aug. 24, 2020).  Costco operated a video surveillance system that recorded and saved all footage for up to 30 days, after which the system recorded over previous footage. Id. at *1–2.  After the fall, one of Costco's employees copied the video onto an external hard drive to preserve it.  Id. at *2.  Two months later, Costco inexplicably lost the hard drive.  Id.  The court found that Costco's actions were unreasonable because it offered no explanation for how it lost the video.  Id. at *3. Although Defendants here have provided explanations for the "technical error" in July 2019 and for how the video was overwritten in July 2020, they provide no explanation for the unreasonable oversights that occurred in the meantime.

For these reasons, the Court finds that the Defendants failed to take reasonable steps within the meaning of Rule 37(e).[5]

---

[4]  Plaintiff also argues that several captains, the assistant sheriff, and the sheriff approved Detective Mitchell's investigation even though the surveillance video was missing. Pl.'s First Suppl. Reply at 1.  However, it is not obvious that they should have known that the video was missing when they signed off on Detective Mitchell's investigation.

[5]  Plaintiff appears to offer two additional arguments, neither of which add to the analysis.  First, Plaintiff argues that Defendants are "at a minimum at fault."  Mot. at 11.  For support, Plaintiff states that Defendants were on actual notice to preserve the videos from the Public Records Act request that Bosco's previous counsel filed.  Id.  This argument goes more towards Defendants' duty to preserve the surveillance video (which they have conceded) rather than the reasonable steps analysis.  Second, Plaintiff argues that Defendants were at fault for not taking the surveillance system server offline in September 2021 after Plaintiff's counsel notified Defendants of the missing video.  Pl.'s First Suppl. Reply at 2–3.  Lieutenant Cleek explained in his

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### B.   Prejudice to Plaintiff

If the Court agrees that Defendants failed to take reasonable steps to preserve the evidence, the next question is whether the loss of evidence prejudices Plaintiff.  The Court concludes that it does.

"The Court has the discretion to determine whether the loss of the information is prejudicial."  Hernandez v. Tulare Cnty. Corr. Ctr., 16-cv-00413, 2018 WL 784287, at *4 (E.D. Cal. Feb. 8, 2018).  "The Court's evaluation of whether the loss of information was prejudicial depends in part on the importance of the information to the case."  Ramirez v. Zimmerman, 17-cv-01230, 2020 WL 905603, at *2 (S.D. Cal. Feb. 25, 2020).  Rule 37(e) "does not place a burden of proving or disproving prejudice on one party or the other."  2015 Advisory Note.  Ultimately, discretion is left to judges "to determine how to best assess prejudice in particular cases."  Id.

Deliberate indifference cases fall under the Eighth Amendment.  "A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment."  Farmer v. Brennan, 511 U.S. 825, 828 (1994). Deliberate indifference lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other."  Id. at 836.  It is best described as "subjective recklessness as used in the criminal law."  Id. at 839–40.  A plaintiff can prove indifference "when prison officials deny, delay, or intentionally interfere with medical treatment."  Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006).

Plaintiff insists that she has been prejudiced because the key issue is "whether correctional staff were indifferent to the known risk that [Bosco] would attempt suicide after being placed in a safety cell in the booking area."  Mot. at 5.  Plaintiff argues that the best evidence of indifference is the missing footage from the Booking 1 and Booking 3

---

declaration that upon learning of the missing video in September 2021, he worked with Regan to take the surveillance system server offline and obtain a loaner system.  Cleek Decl. ¶¶ 6–7. Lieutenant Cleek stated that finding a loaner system prolonged the process.  Id. ¶ 6.  While it did take six weeks for Defendants to take the server offline, Plaintiff offers no argument as to why that amount of time is unreasonable.  Moreover, given that the file had already very likely been deleted for over a year by September 2021, it seems doubtful that this extra six weeks would have made much of a difference.

cameras. <u>Id.</u> at 5–6. She contends that missing video would show "a failure of jail staff to adequately monitor [Bosco]" and that "jail staff were apathetic to his condition" upon discovering him unresponsive. <u>Id.</u> at 13. Lastly, Plaintiff argues that there is no reliable alternative evidence because "the self-serving testimony of jail staff will not suffice." <u>Id.</u> In their briefing, Defendants do not address whether the missing video is prejudicial, seemingly conceding the point.

The Court finds that the missing surveillance video prejudices Plaintiff. The jail staff's actions after discovering Bosco and the time that elapsed before they rendered medical aid are important factual issues. In <u>Lemire v. California Department of Corrections</u>, for example, the Ninth Circuit held that a jury could conclude that "officers trained to administer CPR" acted with deliberate indifference when they discovered an unconscious inmate who had attempted suicide and delayed administering aid for five minutes until medical personnel arrived. 726 F.3d 1062, 1072, 1082–83 (9th Cir. 2013). Here, without the surveillance video, the best evidence of whether jail staff initially denied or delayed medical aid to Bosco is lost. Because Defendants' failure to preserve the surveillance video deprives Plaintiff of critical evidence that they may have used to prove deliberate indifference at trial, the loss of the surveillance video prejudices Plaintiff. Thus, because all of the prongs of Rule 37(e)(1) are met, sanctions are appropriate.

## C.    Intent to Deprive

The severity of the sanctions allowed under Rule 37 increases "upon finding that the party acted with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2). The intent requirement is met where "the evidence shows or it is reasonable to infer, that . . . a party purposefully destroyed evidence to avoid its litigation obligations." <u>Porter v. City & County of San Francisco</u>, 16-cv-3771, 2018 WL 4215602, at *3 (N.D. Cal. Sept. 5, 2018). "Because courts are unable to ascertain precisely what was in a person's head at the time spoliation occurred, they must look to circumstantial evidence to determine intent." <u>Laub v. Horbaczewski</u>, 17-cv-6210, 2020 WL 9066078, at *6 (C.D. Cal. July 22, 2020). "Intent may be inferred if a party is on

1    notice that documents were potentially relevant and fails to take measures to preserve

2    relevant evidence, or otherwise seeks to keep incriminating facts out of evidence."

3    Colonies Partners, 2020 WL 1496444, at *9 (internal quotation marks omitted).  Because

4    Plaintiff has demonstrated that it is reasonable to infer intent based on this record, 37(e)(2)

5    sanctions are appropriate here.

6           Plaintiff makes many arguments that Defendants acted with intent, the majority of

7    which are unpersuasive.  Plaintiff first suggests that the same watch-commander who

8    approved Bosco's placement in the safety cell also selected which videos to preserve.

9    Mot. at 12.  Plaintiff fails to offer any further explanation for why this demonstrates an

10   intent to deprive.  Plaintiff also relies on Lieutenant Squires' deposition in which he

11   testified that he thought a complete video had been loaded onto the thumb drives that he

12   gave to Sergeant Mitchell.  Pl.'s First Suppl. Reply at 3–4.  But Squires did not review the

13   thumb drives and did not know about the error messages that Sergeants Taurian and Teso

14   had encountered in the export process.  Id. at 3–4; Squires Decl. ¶¶ 6–7.  Thus, Lieutenant

15   Squires' belief provides no evidence of intent.

16          However, one of Plaintiff's arguments has merit: Plaintiff argues that Sergeant

17   Mitchell's failure to obtain the complete surveillance video after watching the incomplete

18   version in the course of his investigation "was deliberate and intentional."  Pl.'s First

19   Reply at 6.  While there is absolutely no evidence of any "cropping" of the video by

20   Mitchell, as Plaintiff contends, see Pl.'s First Suppl. Reply at 5, Defendants offer no

21   explanation in their briefing for why Mitchell would not have noticed and asked for the

22   missing video during his investigation.

23          Defendants offered two possible explanations for Mitchell's oversight at the

24   sanctions hearing: (1) Mitchell was only checking to see if Bosco's cell had been checked

25   consistent with jail policy, and because the footage showed a cell check at 9:49 p.m., that

26   allowed him to conclude that the cell checks had been completed as indicated on the log;

27   and (2) as Mitchell was conducting a criminal investigation, he was only checking for

28   possible criminal activity, and as such did not think the lack of footage was necessary to

16

1    come to that conclusion.  See First Schwaiger Decl. Ex. 7 at 6; Mitchell Decl. ¶ 11.  In any

2    case, Defendants maintain that Mitchell simply thought that the footage he received was all

3    there was, and there was no additional footage available.  See Mitchell Decl. ¶¶ 10–11.  In

4    short, Defendants blame Mitchell's oversight on a combination of bureaucratic

5    incompetence and technical error, rather than intent to deprive Plaintiff of the video in

6    question.

7         The Court is unconvinced for two reasons.  First, the parties agree that the currently

8    available video does not show the additional cell check between 9:49 p.m. and 10:06 p.m.

9    that showed jail staff finding Bosco, what time that cell check was, and how long it took to

10   begin administering aid after Bosco was found.  Mitchell was tasked with "establish[ing]

11   the presence or absence of criminal liability on the part of the persons involved in the

12   incident."  See First Schwaiger Decl. Ex. 7 at 6.  The conduct jail staff engaged in during

13   the time immediately after Bosco was found would have been central to this analysis, and

14   the lack of video presumably should have made Mitchell's job much more difficult, calling

15   his attention to the discrepancy.  Second, Defendants take pains to emphasize that this was

16   the first in-custody death for which the jail used its new surveillance system.  See Suppl.

17   Opp'n at 3–4; Defs.' Second Suppl. Brief at 4–5.  If Mitchell knew this—and it is hard to

18   believe that he did not—why would he be more likely to assume that the video he received

19   was "complete" than to think that an error had occurred when downloading the video from

20   a new surveillance system, and some video (indeed, the most important video to the

21   investigation) had not been properly copied over?  This is a critical issue, because if

22   Mitchell had discussed the missing video with Squires or others in the jail at this stage, the

23   video would have been easily recoverable.  As it stands, Defendants ask the Court to

24   assume that Mitchell simply did not believe the missing video ever existed, although other

25   video from the same cameras from earlier in the night in question was given to him.  That

26   Mitchell did not question how or why the video was missing, even though it would have

27   been central to his investigation, beggars belief.

28        Mitchell's failure to seek the missing video is more than the "gross negligence"

17

United States District Court
Northern District of California

typically shown in cases that fail to find intent under Rule 37(e)(2).  In Phan v. Costco Wholesale Corp., Costco made efforts to save surveillance footage onto a hard drive, then lost it.  See Phan, 2020 WL 5074349, at *1.  The court found that this indicated "sloppiness," not intent.  Id. at *4.  But in Phan, there was no one at Costco specifically tasked with investigating the incident; someone was merely in charge of saving the video.  Id. at *1.  Further, a passive failure to halt an automatic deletion process, without more, often does not rise to a reasonable inference of intent.  See, e.g., Porter, 2018 WL 4215602, at *4 (finding that the erasure of a phone record pursuant to a two-year retention policy "amounts to gross negligence, not intentional malfeasance"); Meta Platforms, Inc. v. BrandTotal Ltd., 20-cv-7182, 2022 WL 1990225, at *6 (N.D. Cal. Jan. 6, 2022) (finding that a failure to halt the automatic deletion process of relevant records was not intentional where the movant had not shown intent to be "the most likely explanation" when negligence was equally probable).  But here, more than a failure to halt an automatic deletion process is at issue: Defendants undertook a criminal investigation of Bosco's death that included a thorough review of the video in question while the automatic deletion process could still be halted.

In its second supplemental brief, Plaintiff argues that two out-of-circuit cases support a finding of intent on these facts. Pl.'s Second Suppl. Brief at 2–6.  In Culhane v. Wal-Mart Supercenter, where the injury to the plaintiff occurred at a service entrance, Wal-Mart never took any steps to preserve footage from an exterior camera, but did take steps to preserve footage from an interior camera.  364 F. Supp. 3d 768, 771–72 (E.D. Mich. 2019).  Wal-Mart did not give any reason for why the exterior video was not saved.  Id. at 774.  The court thus found that it had a "reason to be skeptical" of that claim, since the interior video was saved, making the inference reasonable that perhaps the failure to save the exterior footage was intentional.  Id.  In Moody v. CSX Transportation, Inc., involving a railway accident, the defendant in that case had only saved two out of the three files necessary to review the data.  271 F. Supp. 3d 410, 422–23 (W.D.N.Y. 2017).  Failure to save all three files resulted in data that was entirely unreadable.  Id.  When assessing

1    intent, the court pointed out had the defendants attempted to access the data even once over

2    the course of the four years it was in their possession, they would have known that the data

3    was unreadable.  Id. at 431.  This undercut their asserted belief that the data was correctly

4    saved.  Id. at 431–32.

5         This case is more akin to Moody than to Culhane.  Unlike in Culhane, Defendants

6    proffer evidence that they at least made an attempt (though it was unsuccessful) to save the

7    missing video.  In Moody, however, there was a similar unsuccessful attempt to save the

8    missing data, without which the data as a whole—the best evidence of fault in the case—

9    was unreviewable.  Defendants might point out that at least some of the video here was

10   reviewable and was in fact reviewed soon after Bosco's death, thus there is lesser evidence

11   of intent her than there was in Moody, where "defendants' repeated failure over a period of

12   years to confirm that the data had been properly preserved . . . [was] so stunningly derelict

13   as to evince intentionality." 217 F. Supp. 3d at 432.  But Defendants' failures in this case

14   are just as incredible as in Moody: That Mitchell was able to review some video from

15   earlier in the night should have alerted him to the fact that video from the crucial moments

16   when jail staff were alerted to Bosco's condition very likely existed but was not provided

17   to him.  Thus, his failure to alert anyone to those crucial missing minutes and concluding

18   his investigation without the aid of the missing video amounts to more than gross

19   negligence; it is reasonable to infer that Mitchell knew or suspected that the video did exist

20   somewhere and nonetheless kept silent.  His decision not to alert anyone to the

21   discrepancy—thus allowing the missing video to go unnoticed until it was overwritten—is

22   sufficient evidence of intent to satisfy 37(e)(2)'s requirements.

23        Thus, the Court is persuaded that Plaintiff has put forth sufficient evidence to show

24   that it is reasonable to infer Defendants acted with intent to deprive under 37(e)(2), and

25   more severe sanctions may be ordered.

26   **D.    Appropriate Sanction Under Rule 37(e)(2)**

27        Because the Court has found intent under 37(e)(2), it may order appropriate

28   sanctions under that section. Such sanctions include the following:

19

(A) presume that the lost information was unfavorable to the party;

(B) instruct the jury that it may or must presume the information was unfavorable to the party; or

(C) dismiss the action or enter a default judgment.

Plaintiff argues that only a mandatory adverse inference instruction is appropriate to cure the prejudice here.  See Pl.'s Second Suppl. Brief at 7.  Defendants seem to argue[6] for a permissive instruction.  Def.'s Second Suppl. Brief at 8–9.  Even upon a finding of intent, a court need not apply any sanction under Rule 37(e)(2)—rather, "the remedy should fit the wrong."  2015 Advisory Note.

The Court finds that a permissive instruction under Rule 37(e)(2)(B), rather than a mandatory instruction, is warranted here.  Though the missing video is undoubtedly important evidence that may have helped Plaintiff prove her claim, see supra Section III.B, there is other evidence from the night of Bosco's death.  At trial, both sides may put on testimony from witnesses who were present that night and cross-examine them about what they saw and did.  Further, while the missing video was still on the surveillance system, Lieutenant Cleek reviewed it, and can speak to his memory of what it depicted.  See Houston Decl. Ex. A at 43–46.  Plaintiff argues that "the self-serving testimony of jail staff will not suffice," Mot. at 13, but these witnesses would be under oath just like anyone else.  And if their recollections are incomplete or inconsistent, Plaintiff is, of course, free to argue that that is all the more reason the jury should presume that the spoiled video would have been unfavorable to Defendants.

Therefore, the jury shall be instructed that the missing video was spoiled by Defendants and it may presume that the spoiled evidence was unfavorable to Defendants.

---

[6] Defendants' brief is unclear as to whether they argue for a permissive instruction or no sanction at all.  Compare Def.'s Second Suppl. Brief at 8 (discussing permissive instructions given in other cases in the Northern District), with id. at 9 ("[T]here is no evidence to support a sanction against the County under FRCP 37(e) for the accidental loss of portions of video . . . .").  The Court assumes that Defendants argue that sanctions on the whole are not warranted, but, should the Court find that sanctions are warranted (as the Court does), a permissive instruction is most appropriate.

Additionally, the Court finds that an award of attorneys' fees for Plaintiff's counsel's time spent working on this motion (and no other aspects of the case) is warranted. See Porter, 2018 WL 4215602, at *5. Plaintiff's counsel shall submit evidence of the fees and costs incurred as a result of this sanctions motion no later than 21 days from the date of this order.

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiff's motion and orders that the jury be instructed that it may presume that the spoiled evidence was unfavorable to Defendants. The Court further awards attorneys' fees for Plaintiff based on their time spent working on this motion.

**IT IS SO ORDERED.**

Dated: November 14, 2022

CHARLES R. BREYER
United States District Judge